The next case for argument this morning is 172189, District of South Dakota, United States v. Nicholas Ryan Hemsher. May it please the court, my name is Justin Bell. I'm an attorney from Pierce, South Dakota. I represent Nicholas Hemsher in this appeal. There are several issues raised in this appeal. The first is a sufficiency of the evidence regarding Mr. Hemsher's jury trial appeal. The second is whether or not the trial court erred in certain hearsay objection rulings and whether that would necessitate a new trial. Then there are several sentencing guideline issues as well as a sentencing disparity argument. Unless the court directs me otherwise, I'm going to do something that is a little unusual in my practice and I'm going to work backwards on those issues as it relates to this case. And that's not meant as a way to undermine the significance of the other issues, but I do want to start on the sentencing disparity argument and address that. And certainly if the court has any questions for me and wants to address any specific issues other than that, please feel free to jump in and interrupt me. But relating to the last issue that I spoke about, that would be the sentencing disparity issue. It's important to note that in this case, there were four co-defendants originally indicted. Those would be Marshall Wingler, my client, Nicholas Hemsher, and then another individual, Mr. Holsher, who was acquitted at trial. In this case, the facts bear out that Marshall and Wingler, who pled guilty in this case, were the ones who had in their possession seven of the firearms that are at issue in this case. And this is a possession of stolen firearms slash felon in possession case. Those individuals pled guilty. They cooperated with the government in this case. They each received a sentence of six months and seven months, respectively, in this case. My client, Mr. Hemsher, went to a jury trial. And after that jury trial was found guilty, and setting aside the issues related to that trial, at sentencing, my client was sentenced to 120 months of custody in this case. What enhancements, if any, did not apply to the co-defendants in the calculation of their offense level that did apply to Mr. Hemsher's? That's a good question, Judge Kelley, and I would note two things. I don't know the exact enhancements that were applied to that case, in part because of this court's rulings that says that a defendant, a co-defendant, isn't entitled to a PSR or certain information related to a co-defendant's case in challenging a sentencing disparity argument. I would submit that I don't believe that there was an obstruction enhancement that was applied to it. I would presume that there were differences in criminal history categories that would have applied to it. But the other ones would presumably apply. To the extent that another felony enhancement applies, it would apply to both. The number of firearms might not. I think it would, Your Honor. I think that it would be eight, because the theory of the government would apply that that firearm was involved. And I guess, here's the issue that relates to this specific issue. And it's one of the key issues that's being raised, is that the trial court has an obligation, in order for this court to review these types of issues, to at least address the substantive differences in giving co-defendant disparity. If the trial court would have made specific findings as to the differences between this, this court would have a record to review whether or not there was a reasonable basis and whether there was a warranted sentencing disparity for these co-defendants. But the trial court didn't even mention or consider co-defendant disparity in this situation. So, was an objection made on the basis of disparity? No, it was not, Your Honor. There was no specific objection. So, sui sponte, the district court was expected to give an explanation about the disparity. I think under 3553, yes. I wouldn't say that'd be sui sponte. I would say that under the precedent of this court in Lazenby, as well as under 3553, if there is a co-defendant sentencing disparity of this nature, I would say that that would be required of a district court under statute and under this court's precedent. Who was sentenced first? The co-defendants were. So, there would have been ample opportunity for the court. And that is something that the Eighth Circuit has addressed in the past, is that sometimes that's not possible if the longer sentence was done prior. But in this situation, there was an absolute possibility for the district court to weigh these factors in this 3553 analysis. And I would note, and I addressed the Lazenby situation, in that case we're talking about a 12-month versus an 87-month sentencing disparity. In this case, it's significantly more disparate than we saw in the original 2006 Lazenby decision. There are also two other major differences, aren't there? One is that the cooperators probably received acceptance of responsibility adjustments, and as cooperators, likely got a 5K1 motion, right? Yeah, I think that's likely, Your Honor. I would simply state, though, that even with that, that this is unwarranted. If one were to look at the differences between that, that it would be unwarranted, even with a reduction for 5K1 or Rule 35 in this case, it presumably would have been a 5K1 motion that was made. But regardless of that, and the two points for acceptance, or three points of acceptance for responsibility if those applied, this would be unwarranted based off of that. Did both Wingler and Marshall testify against both Hempshire and Holsher? That's a compound question, so I'm going to ask it. I'll answer it in this way. They both testified. They both testified against my client, Hempshire. They did not implicate Holsher, per se, because they could not identify. So the jury would not have been in a position to disbelieve those two cooperators in connection with their acquittal of the other fellow? I'm not going to. I would only simply state that I can't speculate as to the decision-making of the jury in this case, Your Honor. I would state that their testimony, and if you look at the briefing on the sufficiency of the evidence, is contradictory throughout the trial. It's not particularly easy to follow, and there's substantial differences in the time frame that relate to that. But I would simply state that they did not implicate Holsher in this case specifically, at least not in any evidence that was put before the jury. I would like to turn to the obstruction enhancement, if the Court has no further questions on the sensing disparity argument. The entirety of the obstruction enhancement is based off of documentary evidence. It's based off of some text messages or emails that were sent between people. And simply put, the trial court relies on the Brisbane case, which is an unpublished Eighth Circuit case, which allowed for the enhancement of obstruction based off of a PSR being threatened to put into a public space, specifically a social media, Facebook-type platform. I would simply state that that opinion is not appropriate to apply in this case. Hampshire simply was, if you look at the actual message that was relayed, it was a message saying, please tell somebody that I'm not a cooperating witness. It's the other person who's alleging that I'm the cooperating witness that is the cooperating witness in this case. There's no evidence of a threat. There's no evidence that that was intended to dissuade Marshall or Wingler in their testimony. It was simply a rebuttal of what happened, that my client was being accused of being a cooperating witness. Now, the vernacular is a little bit different. The word is snitch, and there's some swear words that's used in the actual transcript. Was Mr. Hampshire in custody at this time? Yes. So he had access to the ability to text? Yes, Your Honor. There's some software that's allowed that is monitored closely as- This did come from a correctional facility? Correct, as it relates to that. But there's no threat of violence with that. It's simply a way to try to talk, to rebut the accusation that's being made against my client. As it relates to the conversation with Amber Weber that the district court relied on, she stated that, the district court, excuse me, stated that that message could have been viewed as suborning perjury. I would simply state that it's a message that's similar to the Emmert decision, that's essentially saying stay strong. These people were in a relationship together prior to the trial, and at the time that that message was sent, I don't believe that under the case law that an obstruction enhancement is warranted based off of those two Marshall or Wingler, and it was simply a conversation between people in a romantic relationship that was akin to stay strong. As it relates to another felony enhancement that was put on, I would simply state that if the court looks at application note 13D in the guidelines internally, it states if the defendant used or transferred one of such firearms in connection with another felony, then in parentheses, i.e., an offense other than a firearms or trafficking offense, and in parentheses, an enhancement under B6B would also apply. Now, that's not a specific comment that relates to the enhancement that was at issue, but it's clearly a reference to the definition of the word another felony. There's an internal definition in the sentencing guideline under B6B that would specifically say that it only applies to other non-firearm offenses, and so if looking at that, this isn't so much a double-counting argument as much as saying that the guidelines internally don't define another felony as being a felony that is a firearms offense, and I would submit to the court that that should not apply in this situation. If you look at application 14, which applies to B6B, which is at issue here, it talks about the explosive or firearm possession or trafficking offense, and isn't it reasonable to read that as the offense charged, which here is possession? Your Honor, that's a good question. I think that you could read it that way, but I think that the fact that that's the definition that you're referring to, that definition is further clarified through another application note, and so since there's another application note that specifically says, i.e., means in other words, if another application note says an offense other than a firearms offense, I think that definition is modified by the internal use of that in a separate application note. I accept that that application note applies to B5. That is correct, and there's a more general applicable one and a more specifically applicable one, but there's nothing that would change why that note would change the definition only as it relates to that specific section. I mean, I think you can infer that that would apply otherwise. Because I'm into my rebuttal time, I'll be very brief on hearsay and just say those can be reviewed for plain error. I would submit to the court that those should be reviewed for plain error, and that they were incorrect in being decided that way, and I rely on the briefing for those. And regarding the insufficiency of the evidence, given the course of case law that says if no rational finder of fact could rely on a cooperating witness to get to a reasonable doubt, I would say that simply based off of the fact that cooperating witness plus all of the inconsistencies that are shown throughout the record in their testimony, that this court should reverse on backgrounds. And I would simply ask the court to either find that it was insufficient evidence or remand for a new trial or for resentencing. Thank you, Your Honors. Morning, Your Honors. Morning. I'm Kevin Colliner with the U.S. Attorney's Office in South Dakota. I'll be presenting for the government. I'll lower this real quick. I'll go in the same order that defense counsel has gone and first addressed the sentencing. Questions were asked about differences between Mr. Hempshire and his co-defendants who were convicted as part of the plea agreements. There was a difference in terms of the number of guns, and I say that without having their pre-sentence reports in front of me, but my understanding is that there were only seven guns attributable, which triggered a lower enhancement. There was also a reduction for acceptance responsibility, and there were five Ks in this case. Another significant factor here is that I just looked at the PSR pre-sentence report for Mr. Hempshire, and his criminal history spans 64 paragraphs in that report. That's one of the longest criminal histories that I've seen in my years as a federal prosecutor, and probably one of the longer ones this court has seen going through so many of these over the years. It's an incredibly long criminal history, and that's one of the things that the district court focused on when going through 3553 factors, talking about the nature and characteristics of this particular defendant. Now, this was a low range of the guidelines sentence, which also means there was a presumption of reasonableness. Of course, that's the guidelines with these enhancements. The Lazenby case, aside from those distinctions, was also a pre-Gaul, pre-Feimster case. Of course, this court has held over and over since Gaul and since Feimster that district courts are not required to do a rote recitation of 3553 factors, and what we're looking for is this sort of individualized sentencing that's part and parcel of the post-Gaul sentencing regime, and we certainly have that here. We have a district court not only who sat through the trial, of course, and heard all of the nature and characteristics of this crime, but in the sentencing hearing itself gave great weight to individualized factors of this defendant. Were the other two, Marshall and Wingler, were they also felons? They were, and that was part of their convictions. Were the charges the same filed against, I'll say, all three that were convicted? I believe that's correct, and they were all co-defendants initially, and then those two pled, the other two went to trial, and Mr. Holsher was acquitted. So you've got the same charges, essentially the same conduct with the exception of the acceptance of responsibility obstructive behavior. So I'm assuming the other two did not get the obstruction enhancement. Right, no obstruction. So is there anything in the record about the value of their cooperation and whether their cooperation extended beyond Mr. Hemsher? Because, frankly, six and seven months in a firearm case where the district court talks about how she believes that they were intending to traffic these guns, six and seven months is pretty low, I think, if you look across the districts. I'm going, again, on memory here, Your Honor, but I believe that what it reflected was about a 50% reduction from their guidelines. And that's commensurate with other 5K reductions that the district court has given in other cases. So the big difference in the guideline range between these defendants and some of these enhancements, we're talking about four-level enhancements. And, of course, two points for acceptance, the obstruction, it did raise his, especially when combined with his highest-level criminal history category, it raised his guideline range up to that. We probably have to assume that the four-level enhancement for possession and connection with was not applied to the other two. I'd be going strictly on memory here. I don't want to say without knowing for sure, Your Honor. Going next to the obstruction enhancement, this court engages in clear error analysis when assessing whether the district court correctly applied the facts to this guideline. Here we have a variety of texts that are described in the record. Those were texts that were on an iPad that's issued by the county jail where Mr. Hempshire was being held pretrial. And they were texts that regard trying to get a third party, Ms. Weber, to contact a guy named Mike Spath. And there was testimony at sentencing from one of the case agents talking about who this Mr. Spath was. What is not in the record but what is public record is that Mr. Spath was a federal defendant who had been sentenced by this very district court about a month and a half prior on firearms charges. So the identity was testified about at the sentencing and known to the district court that this was a man who is someone one might want to contact if they wanted harm done to a cooperating witness. Now, there are different takes, certainly, on what the texts meant, but the district court did not clearly err when determining what this was. This was an attempt to reach out through a third party to get someone to silence a witness. Those texts are all in the record, and we do believe that it mirrors the Brisbane case in the sense that it's the reaching out to a third party to try to silence witnesses. With respect to the another felony enhancement, Your Honor, Judge Grunder, you're exactly right that 14C is the controlling analysis here, and the definite article, the use of the word the, is important, and it's important because this court has already found that to be the case. That's the U.S. v. Jackson case, 633 F 3rd 703 from 2011, where this very issue was at issue, and the court found that the use of the definite article the is a clear reference on plain language reading of that application note that means that the exclusion only applies to the underlying felony of conviction. So that's a decided issue. Should this have been a B-5 enhancement? It could have been a B-5 enhancement, and the case that defense points out from the Seventh Circuit is a case in which that court found it was double counting to apply both the B-5 and the B-6. This issue arose in the addendum. It's the district court record. It's document 332. That's the probation office's responses to the various objections to the pre-sentence report, and objection number four was about this application. The probation office, in fact, responded and said we could have applied either of these, and we chose B-6. They didn't cite that Seventh Circuit case, but it was clear they were concerned about double counting. I mention that because if this court were to be very concerned about this application of B-6B, it would be a harmless error issue because the result would be a remand for resentencing. B-5 could be applied just the same, and we'd be at the very same guideline range because that's also a four-level enhancement. Does B-5 require the actual trafficking? I don't have the language of B-5 in front of me. No, it says if the defendant engaged in the trafficking of firearms. Well, here we have him doing the first step, right? We have seven of the guns being taken from the tattoo shop over to Mr. Wingler's apartment where they were found. We have all the messages, of course, showing that this was, and the testimony showing that this was to sell these guns. So when is trafficking completed, I guess, is the question. Perhaps that's a metaphysical question, but here we have the movement of the guns from one place to another for the purpose of selling them. In terms of the sufficiency of the evidence, that takes up a big part of the briefing in this case. I wanted to talk briefly about it. This court, of course, is well-versed in the standard of review on claims of insufficient evidence. All reasonable inferences, all credibility questions, all factual conflicts are cast in favor of the verdict. Here there's kind of two facts, two general facts that are really in dispute on appeal, and that's whether this defendant knowingly possessed the firearm and whether he knew that they were stolen. In terms of his knowing possession of firearms, we have one of the stolen guns in the car he's driving when he was arrested. We have testimony of Mr. Wingler and Mr. Marshall testifying they saw all of the guns at his tattoo shop. We have guns that are found at Mr. Wingler's apartment, and we have Mr. Hempshire being seen by officers surveilling that apartment that night, coming and going from that apartment where the guns are found. It's a very important fact that ties him to the place where the guns are found. The very night that the guns are found, he's coming and going from there. We have all the text corroborating this arrangement. We've got the testimony from Mr. Wingler that he got the guns from Mr. Hempshire, that he was supposed to sell them. We've got the testimony from Mr. Marshall that Mr. Hempshire came over and held a gun to his head that night at the apartment, and the description of the gun matches the Glock that was found in the vehicle Hempshire was driving. There's a lot of evidence here that ties Mr. Hempshire to all eight of these firearms and his knowing possession of them. The second question is, did he know they were stolen? Well, we have testimony from Mr. Wingler saying that Hempshire told him that the source of the guns was he got them from his buddy who stole them from his dad. So that alone would be sufficient on this record. But we also have all the reasonable inferences that can be drawn from the fact that the nature of the sale of these guns, they weren't going to be sold at a pawn shop, they weren't going to be sold on Craigslist, they weren't going to be sold at a gun show. They were being sold through a third party at a very low rate for the guns at issue. This was an effort to sell them through a middleman, and the middleman was going to get to keep a large cut. There was nothing at all about this plan to sell the guns that hinted of any sense of legitimacy. Also, these guns were completely uncased, right? They were being dragged around in a duffel bag at the time that they were found. So a lot of evidence also that Mr. Hempshire knew that these firearms were stolen. We believe from all that there is a clear finding, a clear ability for this court to find there was sufficient evidence. I have some time left on the clock. If the court has any questions on the remaining issues, I'm happy to answer them. Otherwise, I'll rest on the briefs. Thank you. Hearing none, thank you. May it please the court, I just have a few things to add as it relates to this matter first. The issues regarding Mr. Spath, the government said it best, none of this is in the record. I mean, you can't rely on evidence of his community knowledge that this person would be someone that you would contact. There's no testimony to that as it relates to this. All this is is documentary evidence of a text message that was sent, trying to defend himself for being accused to be a contributor, a cooperating business. And Mr. Spath was in custody as well based on his recent conviction? That's my understanding, yes. That's not in the record either? No, I think that there is testimony that Mr. Spath was in custody. I don't know at what point in the record as to what exact dates he was in the record or not. But if you read the record and the text messages, it is apparent in the record that he would be in custody at the time, Judge Kelly. But that's not the same as Brisbane. Brisbane is a situation where someone's going to post a PSR on Facebook, and the cooperating witnesses would have seen it. There's no evidence in this situation at all. There's no evidence of a threat, and there's no evidence of suborning perjury. Regarding the Gaul issue in Lazenby, Lazenby hasn't been overturned, whether or not it's pre- or post-Gaul doesn't change the fact that this circuit recognized and has recognized co-defendant disparity for over ten years and a district court should have to address those factors. Regarding U.S. v. Jackson, I would simply submit that the court didn't address the issue that was raised in my brief. And I would also just state regarding the insufficient evidence standard that a lot of the things that were stated by the government aren't in the record. I know that's their theory, but I would ask the court to look at the record and that evidence. With that, thank you very much for your time, judges. Mr. Bell, the court appreciates your willingness to accept the CJA appointment. Counsel, we appreciate your arguments today, and the case will be submitted and decided as soon as we can. Thank you.